[Cite as *State v. Kline*, 2023-Ohio-2906.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY


State of Ohio                                    Court of Appeals No.  WM-22-008

      Appellee                              Trial Court No. 22CR000040

v.

Melissa J. Kline                              **DECISION AND JUDGMENT**

      Appellant                            Decided:  August 18, 2023

* * * * *

Katherine J. Zartman, Williams County Prosecuting Attorney,
for appellee.

Eric J. Allen, for appellant.

* * * * *

**ZMUDA, J.**

## I.    Introduction

{¶ 1} Appellant, Melissa Kline, appeals the judgment of the Williams County

Court of Common Pleas, sentencing her to three years of community control after a

bench trial at which the court found her guilty of one count of theft.  Because we find that

the trial court's determination of guilt was not against the manifest weight of the evidence, we affirm.

## A. Facts and Procedural Background

{¶ 2} On March 15, 2022, appellant was indicted on one count of theft in violation of R.C. 2913.02(A)(1) and (B)(2), a felony of the fifth degree. The theft charge stemmed from an incident that occurred on December 31, 2021, during which appellant stole a wallet and set of keys belonging to the victim, K.S., from the coffee machine counter at Burger Dairy in Bryan, Ohio.

{¶ 3} On May 24, 2022, appellant appeared before the trial court for arraignment, at which time she entered a plea of not guilty to the sole count in the indictment. The matter then proceeded through pretrial discovery. On June 29, 2022, appellant waived her right to a trial by jury. Ultimately, the matter was tried before the bench on September 12, 2022.

{¶ 4} K.S. was the first witness called by the state to testify at trial. K.S. is a resident of Fort Wayne, Indiana, but previously worked at the Burger Dairy from July 2020 until January 2021. While employed at Burger Dairy, K.S. became friends with S.C. On December 31, 2021, K.S. drove to Burger Dairy to pick up S.C. so the two could go to a New Year's Eve party together.

{¶ 5} K.S. arrived at Burger Dairy at approximately 9:30 p.m. Regarding what he did upon arrival, K.S. testified: "I walked in and I talked to [S.C.] and she had another

2.

worker that was there. It was a newer person. I can't remember her name but I just kind of talked with her and that was there. And then I walked to the back after I had left my wallet and keys on the counter and then when I came back our they were gone."

{¶ 6} K.S. explained that his wallet was a "brown, leather wallet," and confirmed that it was a "man's wallet." Further, K.S. stated that the wallet contained, among other things, a Premier Bank MasterCard debit card.

{¶ 7} After realizing that his wallet and keys were missing from the counter on which he left them, K.S. called the police. While waiting for the police to arrive, K.S. reviewed Burger Dairy's video surveillance footage, which depicted appellant and another individual, Lisa Borton, together at Burger Dairy. The video footage was introduced as State's Exhibit 1 and played at trial without objection. In the video, appellant is shown grabbing K.S.'s wallet and keys from the counter and then walking over to Burton and handing the wallet to Burton, who then placed the wallet into her coat pocket.

{¶ 8} During his testimony, K.S. indicated that he did not give appellant or Lisa Borton permission to take his wallet or his keys on December 31, 2021. Indeed, K.S. testified that had never met appellant or Lisa Borton prior to seeing them on Burger Dairy's surveillance footage.

3.

{¶ 9} After confirming that someone took his wallet and keys, K.S. removed the battery from his vehicle to prevent it from being stolen. K.S. then proceeded to the New Year's Eve party.

{¶ 10} Within an hour of the theft, K.S. received a text message from his bank inquiring as to whether certain charges from his debit card were fraudulent. K.S. identified that two of the charges were fraudulent. These charges were for the purchase of beer and cigarettes from a nearby Shell fuel station in the amounts of $47.75 and $56.47. At trial, the state admitted receipts of those transactions. K.S. reviewed the receipts, which contained his signature, and confirmed that he did not sign them.

{¶ 11} Subsequently, K.S. received three messages on Facebook Messenger, screenshots of which were admitted at trial. The messages came from Borton's Facebook profile. The first two messages were sent on January 1, 2022. The first message reads: "Hello this is Lisa Melissa Klein we would like to talk." The second message contains a screenshot of a handwritten apology letter signed by appellant. In the letter, appellant wrote:

> First I want to apologize for my mistake not through the courts or police but to you from my heart. I take full responsibility for my part in the situation. I can't imagine how you felt with your personal belongings taken from you. I'm finding it hard to believe I would partake in this situation. I know better. I've been struggling for the last few months over my recent

4.

loss of my father.  He was not just my father but my strength, foundation, my reason for even being.  I'd taken care of him for 10 years and he's just gone now.  It [has] taken me to places of confusion I've never had before.

I'm in no way trying to take my responsibility away for my wrongdoing, only trying to understand how I let it happen.  I can not put into words my sorrow and regret.

I hope you can find it in your heart to forgive me.  I'm not so sure I can forgive me, and there is no worse punishment than when I know my dad is looking down on me ashamed.

I would like the opportunity to have a conversation with you via phone or in person regarding this whole situation.  I would also like to give back all that was taken from you.

Finally, on January 4, 2022, K.S. received a third message, which reads: "Hi [K.S.], I'm sorry for what my so-called friend did to you.  I was not made aware until after the fact I'd like to make things rite (sic) on my part if I can?  Because I'd never do that to anyone and I didn't know about it!"

{¶ 12} At the conclusion of K.S.'s testimony, the state called patrolman Matthew Sammons of the Bryan Police Department for its second witness.  Sammons was the officer who was dispatched to Burger Dairy after the theft at issue in this case was reported.  Upon arrival at Burger Dairy, Sammons spoke to K.S. and the restaurant

5.

manager, who proceeded to show him the restaurant's video surveillance footage depicting the theft of K.S.'s wallet and keys. Shortly thereafter, Sammons took a written statement from K.S., who showed Sammons the fraud alerts he received on his mobile phone.

{¶ 13} On January 1, 2022, Sammons visited the Shell fuel station at which K.S.'s debit card was used to purchase beer and cigarettes. Sammons reviewed the fuel station's video surveillance footage that shows Borton using K.S.'s debit card to purchase beer and cigarettes.

{¶ 14} On January 7, 2022, Sammons interviewed appellant. During the interview, appellant referenced her apology letter that she sent to K.S. via Facebook Messenger, and she provided a written statement in which she claimed to have been under the mistaken impression that the wallet she took from the counter at Burger Dairy belonged to Borton. Appellant denied any wrongdoing concerning K.S.'s wallet and keys, insisting that she only gave the wallet to Borton after Borton told her that the wallet belonged to her.

{¶ 15} Appellant was questioned concerning K.S.'s vehicle keys, but she could not recall anything concerning the whereabouts of the keys. However, Sammons testified that appellant returned K.S.'s keys on January 14, 2022, at which time she said that she found the keys in the center console of her truck.

6.

{¶ 16} Borton was the third witness called by the state to testify at trial. When asked to describe the events that took place at Burger Dairy on the evening of December 31, 2021, Borton stated:

Um, Melissa and I had went to the Burger Dairy to pull [lottery] tickets. And we walked in together. She walked up to the counter. I went to the ticket machine. And I was on the phone with my son because he is a big gambler and he pulls tickets there quite a bit. And he said that there was probably a winner in this one ticket. So I was on the phone with him asking him what ticket it could be.

So from there, she did what she had to do and well, she came over to me and she said something to me. I don't recall what she said to me at the time but she handed me a wallet. And I put the wallet in my coat, my coat pocket.

{¶ 17} Upon further questioning, Borton acknowledged that the wallet did not belong to her. However, she maintained that she took possession of the wallet because, at the time, she believed the wallet belonged to appellant.

{¶ 18} After exiting Burger Dairy and making their way to appellant's vehicle, Borton and appellant discussed the wallet and appellant told Borton that "she had found this wallet." Thereafter, appellant and Borton opened the wallet to investigate the contents inside. As its direct examination of Borton continued, the state asked, "Okay

7.

was there at any point any mention that night that [appellant] thought this was your wallet?" Borton responded in the negative.

{¶ 19} The two then made their way to the nearby Shell fuel station, where Borton purchased beer and cigarettes for herself, her boyfriend, and appellant. During her testimony, Borton admitted that she used K.S.'s debit card to make the purchase. Upon leaving the Shell fuel station, appellant and Borton returned to Borton's home. Borton discarded K.S.'s wallet by throwing it out of appellant's vehicle and onto the roadway.

{¶ 20} Upon returning to her home at the end of the evening, Borton discovered that an image of her face was being circulated on Facebook in connection with the theft of K.S.'s wallet. Upon learning that she was implicated in the theft, Borton attempted to communicate with K.S. via Facebook Messenger to apologize for her involvement. She testified that she wrote K.S. a letter, but "did not send it." Further, Borton indicated that she sent the message to K.S. maintaining that she was unaware that the wallet was stolen at the time and apologizing for "what my so-called friend did to you." At trial, Borton admitted that she was dishonest with K.S. when she claimed ignorance that the wallet was stolen. On cross examination, Borton stated that she and appellant each wrote apology letters to K.S. At appellant's request, Borton sent appellant's letter to K.S. through Borton's Facebook Messenger account. Borton acknowledged that she led appellant to believe that she would send her own apology letter as well, despite having no intention of doing so.

8.

{¶ 21} At the conclusion of Borton's testimony, the state rested. Thereafter, appellant rested without calling witnesses or moving for an acquittal under Crim.R. 29. The matter proceeded immediately to closing statements, at the end of which the trial court took the matter under advisement.

{¶ 22} Two weeks later, on September 26, 2022, the trial court announced its verdict, finding appellant guilty of the sole charge of theft. The court then ordered the preparation of a presentence investigation report and continued the matter for sentencing.

{¶ 23} Appellant's sentencing hearing was held on November 8, 2022. At the hearing, the trial court found that a community control sanction was consistent with the principles and purposes of sentencing under R.C. 2929.11, and thus ordered appellant to serve three years of community control in lieu of a prison term. Thereafter, appellant filed her timely notice of appeal.

### B. Assignments of Error

{¶ 24} On appeal, appellant assigns the following error for our review:

> The conviction for theft is against the manifest weight of the evidence.

### II. Analysis

{¶ 25} In appellant's sole assignment of error, she argues that her theft conviction was against the manifest weight of the evidence because the evidence demonstrates that

9.

she thought that the wallet she took from the counter at Burger Dairy belonged to Borton when she took it.

{¶ 26} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 27} Here, appellant was convicted of theft in violation of R.C. 2913.02(A)(1), which provides:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent.

{¶ 28} The facts are not in dispute in this case. The state's evidence clearly established that appellant exerted control over K.S.'s property by removing his wallet and keys from the counter at Burger Dairy on December 31, 2021. Appellant subsequently

10.

gave the wallet to Bolton, who then used the debit card inside the wallet to purchase beer and cigarettes at the nearby Shell fuel station. Further, the evidence demonstrates that K.S. never consented to appellant's exercise of control over his wallet. Indeed, he testified that he did not authorize appellant to take his wallet. Thus, the only issue in this case is whether appellant, in taking the wallet, had the requisite purpose to deprive K.S. of his property, which hinges on whether she knew that the wallet belonged to someone other than Borton at the time she took it and gave it to Borton.

{¶ 29} In support of her contention that her theft conviction was against the manifest weight of the evidence, appellant references a written statement she provided law enforcement after the theft, in which she stated that she "noticed [Borton's] wallet on [the] counter that you get drinks and picked [it] up * * *. I walked over where [Borton] was getting pull tabs, asked if this is her wallet [and] she said yes and put it * * * inside her coat." Relying upon this statement, appellant argues on appeal that she clearly believed that the wallet belonged to Borton. Further, appellant notes that she "did not accompany [Borton] into the Shell station when [Borton] made the purchase and no other evidence was provided that she knew it was not Burton's wallet." We disagree.

{¶ 30} The evidence presented at trial demonstrates that appellant purposely deprived K.S. of his property, namely his wallet and keys, with knowledge that those items did not belong to Borton. Indeed, in her apology letter to K.S., appellant expressed sorrow and regret over her "wrongdoing," and took "full responsibility" for her part in

11.

the theft. Moreover, appellant wrote, "I know better," and expressed to K.S. her desire to "give back all that was taken from you." These admissions undercut appellant's argument on appeal and the position she took in her written statement to law enforcement wherein she claimed that she thought the wallet belonged to Borton when she took it.

{¶ 31} Furthermore, Borton's testimony concerning the discussions she had with appellant after the theft supports the notion that appellant knew that the wallet did not belong to Borton. Specifically, Borton testified that appellant never indicated to Borton that she thought the wallet was Borton's. Rather, appellant told Borton that she found the wallet and then proceeded to open the wallet alongside Borton to check it for cash.

{¶ 32} Taken in its entirety, the evidence contained in the record supports the trial court's determination that appellant purposely deprived K.S. of his property, knowing at the time that she took the wallet and keys that they belonged to someone other than Borton. Thus, we do not find that the trial court, as the trier of fact in this bench trial, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Consequently, appellant's theft conviction is not against the manifest weight of the evidence, and her sole assignment of error is not well-taken.

12.

## III.    Conclusion

**{¶ 33}** In light of the foregoing, the judgment of the Williams County Court of Common Pleas is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                    _____
                                                              JUDGE
Gene A. Zmuda, J.

                                                          _____
Charles E. Sulek, J.                                      JUDGE
CONCUR.

                                                          _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.